64 A.3d 536

EDWARD NICHOLAS AND TRACY NICHOLAS, PLAINTIFFS–RE-
SPONDENTS, v. DR. CHRISTOPHER MYNSTER, DR. REKHA
SEHGAL, JOSEPH J. DIORIO, M.D., DR. TIMOTHY RHYMES,
SJH REGIONAL MEDICAL CENTER, STIHL INCORPORATED,
AND FRANCIS CARINI, DEFENDANTS–APPELLANTS.

Argued October 11, 2012—Decided April 25, 2013.

466

*Mary Ann C. O'Brien* argued the cause for appellant Dr. Christopher Mynster (*Crammer, Bishop & O'Brien,* attorneys).

*Karla M. Donovan* argued the cause for appellant Dr. Rekha Sehgal (*Buckley & Theroux,* attorneys).

*E. Drew Britcher* argued the cause for respondents (*Britcher, Leone & Roth* and *Saltz Mongeluzzi Barrett & Bendesky,* attorneys; *Brian E. Fritz,* on the briefs).

*Abbott S. Brown* submitted a brief on behalf of amicus curiae The New Jersey Association for Justice (*Bendit Weinstock,* attorneys; *Mr. Brown* and *Alan Y. Medvin,* on the brief).

*John Zen Jackson* submitted a brief on behalf of amici curiae Medical Society of New Jersey and The American Medical Association (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys; *Mr. Jackson* and *Cecylia K. Hahn,* on the brief).

Justice ALBIN delivered the opinion of the Court.

In this medical-malpractice case, we must determine whether, under the New Jersey Medical Care Access and Responsibility and Patients First Act (Patients First Act or Act), *L.* 2004, *c.* 17, codified in part at *N.J.S.A.* 2A:53A–41, plaintiffs' medical expert possesses the statutory credentials necessary to testify against defendant physicians. In both *Ryan v. Renny,* 203 *N.J.* 37, 999 *A.*2d 427 (2010), and *Buck v. Henry,* 207 *N.J.* 377, 25 *A.*3d 240 (2011), we held that, generally, a plaintiff's medical expert testifying to the standard of care allegedly breached by a defendant physician must be equivalently credentialed in the same specialty or subspecialty as the defendant physician. Here, the two defendant physicians who treated plaintiff Edward Nicholas for carbon monoxide poisoning were board certified in emergency medicine and family medicine. Plaintiffs' expert physician was board certified in internal and preventive medicine and specialized in hyperbaric medicine, including the use of hyperbaric oxygen in the treatment of carbon monoxide poisoning.

Defendants moved to bar the testimony of plaintiffs' expert and for summary judgment. Defendants claimed that plaintiffs' expert could not testify to the standard of care because he did not practice in the same medical specialty as defendants. The court denied the motion to bar plaintiffs' expert from testifying. The court ruled that expertise in the treatment of the condition was sufficient even if the expert did not share the same medical specialty as the defendant physicians. The court implicitly denied the summary judgment motion as well. The Appellate Division denied defendants' motion for leave to appeal.

We now reverse. *N.J.S.A.* 2A:53A–41 of the Patients First Act requires that plaintiffs' medical expert must "have specialized at the time of the occurrence that is the basis for the [malpractice] action in the same specialty or subspecialty" as defendant physicians. The trial court failed to apply the equivalency requirements of the Patients First Act.

We reject plaintiffs' argument that, under *N.J.S.A.* 2A:53A–41(a)(1), their medical expert, who did not specialize in either emergency or family medicine, was statutorily authorized to testify because he was "credentialed by a hospital to treat patients for [carbon monoxide poisoning]." Under a plain textual reading of the Act, plaintiffs cannot establish the standard of care through an expert who does not practice in the same medical specialties as defendant physicians. For that reason, plaintiffs' medical expert is barred from testifying to the standard of care governing defendants. Because plaintiffs cannot establish the applicable standard of care, summary judgment must be granted in favor of defendants.

I.

A.

Plaintiff Edward Nicholas is in the business of home construction and remodeling. On April 8, 2005, while operating a gas-powered saw in a homeowner's enclosed basement, Nicholas was

exposed to noxious fumes and became ill. At about 3:00 p.m. that day, Nicholas arrived at the emergency room of South Jersey Healthcare (SJH) Regional Medical Center in Vineland suffering from shortness of breath, respiratory distress, muscle cramps, nausea, and hyperventilation. Dr. Christopher Mynster, a physician board certified in emergency medicine, saw Nicholas on his arrival and directed that a nurse give him 100% oxygen through a face mask.[1] Carbon monoxide poisoning was the suspected cause of Nicholas's condition. After blood gas tests revealed that Nicholas was suffering from "acute carbon monoxide poisoning," Dr. Mynster administered Ativan to Nicholas to deal with his agitation and muscle cramps. Dr. Mynster also called Dr. Rekha Sehgal, the "attending physician," to have Nicholas admitted to the hospital. Dr. Sehgal was board certified in the practice of family medicine.[2]

---

[1] The American Board of Medical Specialties ("ABMS") and American Osteopathic Association ("AOA") recognize a number of specialty practice areas and offer "board certification" in each specialty. A physician seeking board certification must satisfy heightened training and testing requirements. *See* ABMS, *About Board Certification,* http://www.certificationmatters.org/about-board-certifieddoctors/about-board-certification.aspx (last visited Apr. 9, 2013); *AOA Board Certification,* http://www.osteopathic.org/inside-aoa/development/aoa-board-certification/Pages/default.aspx (last visited Apr. 9, 2013).

Physicians specializing in emergency medicine focus "on the immediate decision making and action necessary to prevent death or any further disability both in the pre-hospital setting . . . and in the emergency department." These specialists provide "immediate recognition, evaluation, care, stabilization and disposition of a generally diversified population of adult and pediatric patients in response to acute illness and injury." *ABMS Member Boards, Emergency Medicine,* http://www.certificationmatters.org/abms-member-boards/emergency-medicine.aspx (last visited Apr. 9, 2013).

[2] Physicians specializing in family medicine "deliver a range of acute, chronic and preventive medical care services. In addition to diagnosing and treating illness, they also provide preventive care, including routine checkups, health-risk assessments, immunization and screening tests, and personalized counseling on maintaining a healthy lifestyle." Family-medicine specialists "also manage chronic illness, often coordinating care provided by other subspecialists." *ABMS Member Boards, Family Medicine,* http://www.certificationmatters.org/abms-member-boards/family-medicine.aspx (last visited Apr. 9, 2013).

Dr. Sehgal consulted with Dr. Mynster and transferred Nicholas to the Intensive Care Unit. There, Dr. Sehgal continued Nicholas on a regimen of 100% oxygen and Ativan. In addition, she prescribed the drug Zofran[3] and directed that Nicholas's carbon monoxide levels be monitored. By 4:00 p.m., Dr. Sehgal turned Nicholas's care over to Dr. Timothy Rhymes, Nicholas's primary care physician.[4]

Ultimately, Nicholas suffered brain damage, including a seizure disorder, and other bodily injuries as a result of carbon monoxide poisoning.

### B.

On March 29, 2007, plaintiffs Nicholas and his wife, Tracy, filed a medical-malpractice action in the Superior Court, Law Division against Dr. Mynster and Dr. Sehgal and five other named defendants.[5] The complaint alleged that, in treating Nicholas for carbon monoxide poisoning, Drs. Mynster and Sehgal "fail[ed] to provide medical care in conformance with the requisite standards of medical care." The complaint specified that Drs. Mynster and Sehgal failed to order proper diagnostic testing, to administer adequate amounts of oxygen to Nicholas, and to refer Nicholas to specialists and a facility with a hyperbaric chamber that could "appropriately treat carbon monoxide poisoning." Nicholas's wife filed a loss-of-consortium claim. Plaintiffs alleged that the negligence of the two doctors caused Nicholas to suffer injuries that "may be permanent, irreparable and severe."

---

[3] Zofran is used generally to treat nausea and vomiting. *Physicians' Desk Reference* 1318–24 (54th ed.2000).

[4] Dr. Rhymes also is referred to as Dr. Rhyme in the record.

[5] The five other named defendants are not involved in this appeal: SJH Regional Medical Center, Dr. Rhymes, Dr. Joseph Diorio, Stihl Incorporated (the manufacturer of the allegedly defective gas-powered saw), and Francis Carini (the homeowner who allegedly directed Nicholas as he worked in the basement).

In their answers, Drs. Sehgal and Mynster denied that they acted negligently and demanded that plaintiffs file an affidavit of merit to support their lawsuit, as required by *N.J.S.A.* 2A:53A–27.

C.

Plaintiffs filed affidavits of merit signed by Dr. Lindell K. Weaver, a physician "Board Certified in the medical specialty of Internal Medicine, Pulmonary Diseases, Critical Care, and Undersea & Hyperbaric Medicine," and Dr. James Doghramji, a physician also board certified in Internal Medicine.[6] In both affidavits, Drs. Weaver and Doghramji expressed their opinions that a "reasonable probability" exists that the care exercised by Drs. Mynster and Sehgal in the case of Nicholas "fell outside acceptable professional standards or treatment practices." [7]

Defendant Mynster moved for summary judgment based on plaintiffs' failure to file an affidavit of merit from a specialist in emergency medicine.[8] Defendant Mynster withdrew the motion after plaintiffs submitted Dr. Doghramji's curriculum vitae, which indicated that Doghramji was on the staff of the Department of Emergency Medicine at Chestnut Hill Hospital in Philadelphia, Pennsylvania.

---

[6] A practitioner of internal medicine "is a personal physician who provides long-term, comprehensive care in the office and in the hospital, managing both common and complex illnesses of adolescents, adults and the elderly." *ABMS Member Boards, Internal Medicine,* http://www.certificationmatters.org/abms-member-boards/internal-medicine.aspx (last visited Feb. 7, 2013). "An Internist trained in Critical Care Medicine has expertise in the diagnosis, treatment and support of critically ill and injured patients, particularly trauma victims and patients with multiple organ dysfunction." *Ibid.* An internist who specializes in pulmonary medicine "treats diseases of the lungs and airways." *Ibid.*

[7] The affidavits of Drs. Weaver and Doghramji contained brief summaries of their credentials.

[8] The record does not indicate whether defendant Dr. Sehgal objected to Dr. Weaver's affidavit during case management conferences.

## D.

In advance of trial, plaintiffs presented an expert report only from Dr. Weaver. In his report, Dr. Weaver maintained that he was licensed to practice medicine in Utah and Arizona, board certified in internal medicine with subspecialty certifications in critical care medicine and pulmonary disease, and board certified in preventive medicine with subspecialty certifications in undersea and hyperbaric medicine.[9] Dr. Weaver indicated that he had a clinical practice in hyperbaric medicine and critical care, which "include[d] evaluating and managing patients with acute carbon monoxide poisoning as well as those with sequelae following poisoning." [10] In his view, "[h]yperbaric oxygen is the treatment of choice for acute carbon monoxide poisoning." He explained that treatment with "[h]yperbaric oxygen is accomplished by placing patients within chambers, pressurized with either air or 100% oxygen, while the patient breathes 100% oxygen at pressures greater than sea level." He noted that in 2004 "there were 489 hospital-based hyperbaric chamber systems."

Dr. Weaver posited that "[i]n 2005, the standard of care mandated that Mr. Nicholas should have been referred" for treatment by hyperbaric oxygen. In support of that position, Dr. Weaver cited to several authorities, including himself.[11] In particular, Dr.

---

[9] "A Preventive Medicine specialist focuses on the health of individuals and defined populations in order to protect, promote and maintain health and well-being, and to prevent disease, disability and premature death." *ABMS Member Boards, Preventive Medicine*, http://www.certificationmatters.org/abms-member-boards/preventive-medicine.aspx (last visited Apr. 9, 2013). "A Preventive Medicine physician who specializes in Undersea and Hyperbaric Medicine treats decompression illness and diving accident cases and uses hyperbaric oxygen therapy to treat such conditions as carbon monoxide poisoning, gas gangrene, non-healing wounds, tissue damage from radiation and burns and bone infections." *Ibid.*

[10] Sequelae are "condition[s] following as a consequence of a disease." *Stedman's Medical Dictionary* 1752 (28th ed.2006).

[11] Lindell K. Weaver, *Carbon Monoxide Poisoning*, 360 *New Eng. J. Med.* 1217 (2009); Stephen R. Thom, *Carbon Monoxide Pathophysiology and Treatment, in*

Weaver noted that the editors of the *New England Journal of Medicine* stated in 2002 that "[h]yperbaric-oxygen treatments within 24 hours after acute carbon monoxide poisoning should be the standard of care." 347 *New Eng. J. Med.* 1053 (2002). Dr. Weaver identified the failure of Drs. Mynster and Sehgal to refer "Nicholas immediately for hyperbaric oxygen" as a direct cause of the "severe carbon monoxide-related [sequelae]" suffered by Nicholas. He concluded that, had Nicholas promptly received hyperbaric oxygen, "his problems would have been prevented, or mitigated." It was undisputed that SJH Regional Medical Center did not have the capability of providing hyperbaric oxygen in 2005.

At his 2010 deposition, Dr. Weaver admitted "that there was a difference of opinion in the literature in 2005 as to the indications for hyperbaric oxygen for carbon monoxide poisoning" and that "there was some literature indicating that hyperbaric oxygen therapy could potentially be harmful to patients." He also acknowledged that he neither practiced nor was board certified in the specialties of emergency medicine or family medicine. Dr. Weaver conceded that he did not know how the average physician practicing family medicine would have treated Nicholas in 2005. Nonetheless, Dr. Weaver concluded that both Dr. Sehgal and Dr. Mynster deviated from the accepted standard of care by not referring Nicholas to a facility that provided hyperbaric oxygen therapy.

E.

In September 2010, defendants Mynster and Sehgal moved to bar plaintiffs' use of Dr. Weaver as an expert witness on the

---

*Physiology and Medicine of Hyperbaric Oxygen Therapy* 321 (Tom S. Neuman and Stephen R. Thom eds., 2008); Lindell K. Weaver et al., *Hyperbaric Oxygen for Acute Carbon Monoxide Poisoning,* 347 *New Eng. J. Med.* 1057 (2002); Stephen R. Thom, *Hyperbaric–Oxygen Therapy for Acute Carbon Monoxide Poisoning,* 347 *New Eng. J. Med.* 1105 (2002); J. Stephen Bohan, *Benefit of Hyperbaric Oxygen Therapy for Acute Carbon Monoxide Poisoning, J. Watch Emergency Med.* (Oct. 29, 2002), *available at* http://emergency-medicine.jwatch.org/cgi/content/full/2002/1029/1.

ground that, under *N.J.S.A.* 2A:53A–41, Weaver did not have the requisite credentials to testify to the standard of care applicable to board-certified physicians in emergency medicine and family medicine. Because Dr. Weaver's testimony was necessary to establish an essential element of the medical-malpractice action—the standard of care—defendants also moved for summary judgment.

In December 2010, in a written opinion, the trial court denied defendants' motion to bar Dr. Weaver's testimony. The court determined that Dr. Weaver's lack of board certification in family medicine and emergency medicine concerns the "credibility," not the "admissibility," of his testimony. The court professed that, in *Khan v. Singh,* 200 *N.J.* 82, 975 *A.*2d 389 (2009), we "allowed [an] expert to testify despite the fact that the expert had a different specialty than the defendant doctor." From this observation, the trial court extrapolated that "*Khan* could stand for the proposition that an expert who has a different specialty than the alleged negligent doctor but practices similar medicine is sufficient to allow the expert to testify so long as the similar medicine is reasonably related to the patient's treatment." The court concluded that "Dr. Weaver is a specialist in the course of treatment" that was provided by Drs. Mynster and Sehgal. Because the court allowed Dr. Weaver to testify, it necessarily denied defendants' motion for summary judgment.

The trial court denied defendants' motion for reconsideration, and the Appellate Division denied their motion for leave to appeal. We granted defendants' motion for leave to appeal. *Nicholas v. Mynster,* 208 *N.J.* 333, 27 *A.*3d 947 (2011). We also granted the motions of the Medical Society of New Jersey and American Medical Association (MSNJ/AMA) and the New Jersey Association for Justice (NJAJ) to participate as amici curiae.

II.

A.

Defendants argue that, in denying their motion to bar Dr. Weaver's testimony, the trial court mistakenly applied *Khan* rath-

er than the dictates of the Patients First Act. According to defendants, the Act requires that a medical expert possess equivalent credentials to a defendant physician charged with a breach of the standard of care in his or her medical specialty. Defendants insist that *Khan,* a pre-Patient's First Act case, is not relevant to a case in which the alleged malpractice occurred in April 2005. Defendants point out that *Khan* explicitly recognized that, in addition to the general qualifications for an expert witness, "causes of action accruing after July 7, 2004 ... must also take account of the provisions of the ... Patients First Act." *Khan, supra,* 200 *N.J.* at 100, 975 *A.*2d 389. Because they are board certified in the fields of emergency medicine and family medicine, defendants maintain that plaintiffs' expert, who is board certified in internal and preventive medicine and does not practice in their specialty areas, lacks the equivalent credentials mandated by *N.J.S.A.* 2A:53A-41. Defendant Dr. Sehgal adds that Dr. Weaver, having conceded that he does not know how a family practitioner would have treated Nicholas in 2005, is incapable of rendering an opinion on the appropriate standard of care applicable to her.

Amici MSNJ/AMA also argue that the controlling law is not *Khan* but rather the Patients First Act. MSNJ/AMA proffer that *N.J.S.A.* 2A:53A-41(a) governs a medical-malpractice action in which a defendant physician is board certified in a specialty and the care and treatment involves that specialty. According to amici, two requirements are triggered under the statute in that circumstance. First, the plaintiff's expert must have specialized in the same specialty as the defendant physician who treated the patient. Second, if the defendant physician was board certified, the plaintiff's expert must either meet the hospital-credentialing requirement of *N.J.S.A.* 2A:53A-41(a)(1) or be board certified and meet the additional requirements of *N.J.S.A.* 2A:53A-41(a)(2). Given this approach, MSNJ/AMA conclude that "[i]f the same-specialty and same [b]oard-certification requirements of *N.J.S.A.* 2A:53A-41[ (a) ] mean anything, then they must bar Dr. Weaver

from testifying as an expert against Dr. Mynster and Dr. Sehgal in this case." [12]

### B.

In countering defendants' arguments, plaintiffs rely on *Khan* for the proposition that "medical professionals may express opinions in overlapping fields," 200 *N.J.* at 101, 975 *A.2d* 389 (citing *Rosenberg v. Cahill*, 99 *N.J.* 318, 328–31, 492 *A.2d* 371 (1985)), provided they have " 'sufficient knowledge of professional standards applicable to the situation under investigation,' " *id.* at 100, 975 *A.2d* 389 (quoting *Sanzari v. Rosenfeld*, 34 *N.J.* 128, 136, 167 *A.2d* 625 (1961)). Plaintiffs emphasize that in the medical-malpractice action brought in *Khan*, we expressed "no doubt that [the] plaintiff's experts [in that case], being a board certified orthopedist and neurologist, were qualified to offer opinions about the applicable standard of care" regarding a procedure performed by the defendant, who was board certified in internal medicine, neurology, and pain medicine. Plaintiffs maintain that the practice areas of Dr. Weaver and defendant Drs. Mynster and Sehgal overlap in the treatment of carbon monoxide poisoning, allowing Dr. Weaver to offer an opinion on the standard of care applicable to defendants. Thus, they reason that "[t]he elements of the medical issue (carbon monoxide poisoning), the care setting (emergency room), the treatment provided (breathing oxygen), are all clearly within the bounds of the *'knowledge, skill, experience, training, or education'* . . . of Dr. Weaver."

---

[12] Amici MSNJ/AMA noted that defendant Mynster did not delay in raising challenges to the sufficiency of Dr. Weaver's testimony. Defendant Mynster objected to Dr. Weaver's credentials as an expert when his affidavit of merit was filed. Thus, according to MSNJ/AMA, plaintiffs cannot claim that they were lulled into inaction. *See Ferreira v. Rancocas Orthopedic Assocs.*, 178 *N.J.* 144, 154–55, 836 *A.2d* 779 (2003). Amici do not make a similar argument for defendant Sehgal, who never challenged plaintiffs' failure to present an affidavit of merit from a physician specializing in family medicine. However, the issue of lulling is not before us and therefore we need not address it.

At oral argument, plaintiffs insisted that, under the Patients First Act, Dr. Weaver may offer an expert opinion on the standard of care for treating carbon monoxide poisoning in the case of physicians board certified in emergency medicine and family medicine because he is "credentialed by a hospital to treat" carbon monoxide poisoning. *N.J.S.A.* 2A:53A–41(a)(1). Plaintiffs argue that the hospital-credentialing provision of *N.J.S.A.* 2A:53A–41(a)(1) is an alternative to the equivalent board-certified specialization provision of *N.J.S.A.* 2A:53A–41(a)(2), and the equivalent-specialty requirement of *N.J.S.A.* 2A:53A–41(a).

Amicus NJAJ echoes this position, stating that "any doctor who is credentialed by a hospital to treat the same condition ... is a 'specialist' in the treatment of that condition ... and should be deemed qualified to testify to the standard of care for treatment." [13]

## III.

### A.

This appeal comes to us from the trial court's denial of defendants' motion to bar Dr. Weaver's testimony and its denial of defendants' motion for summary judgment. In reviewing whether

---

[13] NJAJ also raises issues that have never been raised by plaintiffs in the trial court, Appellate Division, or this Court. NJAJ asserts that the Patients First Act violates Article VI of the New Jersey Constitution, which vests in the Supreme Court authority over the rules of procedure in our courts, *N.J. Const.* art. VI., § 2, ¶ 3, and the Evidence Act of 1960, *N.J.S.A.* 2A:84A–33 to –44, which establishes a procedure for creating new rules of evidence. "[A]s a general rule an *amicus curiae* must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties." *Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n,* 91 *N.J.* 38, 48–49, 449 *A.2d* 1254 (1982) (citing *Byram Twp. Bd. of Educ. v. Byram Twp. Educ. Ass'n,* 152 *N.J.Super.* 12, 18, 377 *A.2d* 745 (App.Div.1977); *Endress v. Brookdale Cmty. Coll.,* 144 *N.J.Super.* 109, 123 n. 6, 364 *A.2d* 1080 (App.Div.1976)). We did not grant certification on the additional issues raised by NJAJ. We decline to address these issues because they were not argued by the parties or considered by the trial court and are therefore not properly before this Court.

summary judgment was properly denied, "we apply the same standard governing the trial court—we view the evidence in the light most favorable to the non-moving party." *Murray v. Plainfield Rescue Squad,* 210 *N.J.* 581, 584, 46 *A.*3d 1262 (2012). If a review of the record reveals that "there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law," then a court should grant summary judgment. *R.* 4:46–2(c). In construing the meaning of a statute or the common law, our review is de novo. *Murray, supra,* 210 *N.J.* at 584, 46 *A.*3d 1262 (citing *Manalapan Realty, L.P. v. Twp. Comm.,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995)). We do not defer to interpretative conclusions by the trial court or Appellate Division that we believe are mistaken. *Zabilowicz v. Kelsey,* 200 *N.J.* 507, 512–13, 984 *A.*2d 872 (2009) (citations omitted).

In this case, the facts are largely undisputed. The question before us is an interpretation of law.

## B.

The issue is whether plaintiffs' expert, Dr. Weaver, a board-certified physician in internal and preventive medicine, is authorized to testify to the standard of care applicable to the treatment of carbon monoxide poisoning in a medical-malpractice action involving defendant physicians who are board certified in emergency medicine and family medicine.

To prove medical malpractice, ordinarily, "a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." *Gardner v. Pawliw,* 150 *N.J.* 359, 375, 696 *A.*2d 599 (1997) (internal citations omitted). Generally, an expert witness's qualifications are governed by the *New Jersey Rules of Evidence.* Expert testimony is permitted to "assist the trier of fact to understand the evidence or to determine a fact in issue." *N.J.R.E.* 702. An expert witness's qualifications are assessed based on "knowledge, skill, experience, training, or

education." *Ibid.* By the standards of *N.J.R.E.* 702, one could hardly dispute the qualifications of Dr. Weaver as an expert on the subject of carbon monoxide poisoning and the use of hyperbaric oxygen as a treatment modality. That, however, is not the end of the inquiry here. Rather, the issue is whether, in light of the Patients First Act, Dr. Weaver can testify to the standard of care applicable to physicians who practice in different specialty areas.

C.

The Patients First Act, passed by the Legislature in 2004, is a collection of laws that was intended to reform this State's tort-liability and health-care systems. *N.J.S.A.* 2A:53A-38. Among other things, the Act was a response to the "dramatic escalation in medical malpractice liability insurance premiums, which [was] creating a crisis of affordability in the purchase of necessary liability coverage for our health care providers." *N.J.S.A.* 2A:53A-38(b). The Legislature, in part, attributed the steep increase in premiums to the State's tort-liability system. *N.J.S.A.* 2A:53A-38(d).

One piece of the Patients First Act, incorporated at *N.J.S.A.* 2A:53A-41, "establishes qualifications for expert witnesses in medical malpractice actions" and "provides that an expert must have the same type of practice and possess the same credentials, as applicable, as the defendant health care provider, unless waived by the court." Assembly Health & Human Services Committee, *Statement to Assembly Bill No. 50* at 20 (Mar. 4, 2004). *N.J.S.A.* 2A:53A-41 clearly applies to the medical-malpractice action in this case. How it applies is the question that the parties have debated before this Court.

The trial court erred in not judging the merits of defendants' motion to bar Dr. Weaver's testimony by the terms of this statute. In *Khan, supra,* 200 *N.J.* at 100, 975 *A.2d* 389, we expressly noted that the enhanced-qualification requirements set forth in *N.J.S.A.* 2A:53A-41 applied to causes of action arising after July 7, 2004— the date the Patients First Act went into effect. The facts

underlying the malpractice action in *Khan* arose before passage of the Patients First Act. Therefore, the Act was not the controlling law in *Khan.* But it is here.

As noted earlier, the outcome of this case hinges on legislative interpretation. Before analyzing *N.J.S.A.* 2A:53A–41, we first turn to the canons of statutory interpretation relevant to this case.

### D.

The paramount goal of all statutory interpretation is to carry out the Legislature's intent. *Wilson ex rel. Manzano v. City of Jersey City,* 209 *N.J.* 558, 572, 39 *A.*3d 177 (2012). We begin by giving the words of the statute "their ordinary meaning and significance." *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (internal citations omitted). Words, phrases, and clauses cannot be viewed in isolation; all the parts of a statute must be read to give meaning to the whole of the statute. *See Burnett v. Cnty. of Bergen,* 198 *N.J.* 408, 421, 968 *A.*2d 1151 (2009). In this way, we must construe the statute sensibly and consistent with the objectives that the Legislature sought to achieve. *See DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039. If the statute's plain language reveals the Legislature's intent, our interpretative mission should come to an end. *Ibid.* We resort to extrinsic evidence, such as legislative history, only "if there is ambiguity in the statutory language that leads to more than one plausible interpretation," or "if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language." *Id.* at 492–93, 874 *A.*2d 1039.

Before applying these principles, we first turn to the relevant parts of *N.J.S.A.* 2A:53A–41, which provide:

In an action alleging medical malpractice, a person shall not give expert testimony or execute an affidavit pursuant to the provisions of P.L.1995, c. 139 (C. 2A:53A–26 et seq.) on the appropriate standard of practice or care unless the person is licensed as a physician or other health care professional in the United States and meets the following criteria:

a.  If the party against whom or on whose behalf the testimony is offered is a specialist or subspecialist recognized by the American Board of Medical Specialties

or the American Osteopathic Association and the care or treatment at issue involves that specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association, the person providing the testimony shall have specialized at the time of the occurrence that is the basis for the action in the same specialty or subspecialty, recognized by the American Board of Medical Specialties or the American Osteopathic Association, as the party against whom or on whose behalf the testimony is offered, *and* if the person against whom or on whose behalf the testimony is being offered is board certified and the care or treatment at issue involves that board specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association, the expert witness shall be:

(1) a physician credentialed by a hospital to treat patients for the medical condition, or to perform the procedure, that is the basis for the claim or action; or

(2) a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association who is board certified in the same specialty or subspecialty, recognized by the American Board of Medical Specialties or the American Osteopathic Association, and during the year immediately preceding the date of the occurrence that is the basis for the claim or action, shall have devoted a majority of his professional time to either:

(a) the active clinical practice of the same health care profession in which the defendant is licensed, and, if the defendant is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association, the active clinical practice of that specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association; or

(b) the instruction of students in an accredited medical school, other accredited health professional school or accredited residency or clinical research program in the same health care profession in which the defendant is licensed, and, if that party is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association, an accredited medical school, health professional school or accredited residency or clinical research program in the same specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association; or

(c) both.

[ (Emphasis added).]

To understand *N.J.S.A.* 2A:53A–41(a), we must view the statute's constituent parts to see how each piece operates within the overall scheme. The emphasized word *"and"* that appears in the quoted portion of the statute separates the credentials a challenging expert must have (1) if the defendant physician practices in a specialty but is not board certified *and* (2) if the defendant is board certified in the specialty. When a physician is

a specialist and the basis of the malpractice action "involves" the physician's specialty, the challenging expert must practice in the same specialty. *See Buck, supra,* 207 *N.J.* at 391, 25 *A.*3d 240. A medical expert must be a specialist in the same field in which the defendant physician specializes; there are no exceptions to that requirement other than the waiver provision of *N.J.S.A.* 2A:53A–41(c), which is inapplicable in this case.

If a defendant physician not only practices in an ABMS specialty, but also is board certified in that specialty, then the challenging expert must have additional credentials. Thus, if the defendant physician specializes in a practice area "*and* . . . is board certified and the care or treatment at issue involves that board specialty . . ., the expert witness" then must either be credentialed by a hospital to treat the condition at issue, *N.J.S.A.* 2A:53A–41(a)(1) (emphasis added), or be board certified in the same specialty in the year preceding "the occurrence that is the basis for the claim or action," *N.J.S.A.* 2A:53A–41(a)(2).[14]

▆▆▆ The hospital-credentialing provision is not an alternative to the same-specialty requirement; it only comes into play if a physician is board certified in a specialty. Again, only a specialist can testify against a specialist about the treatment of a condition that falls within the specialty area. The hospital-credentialing *provision is only a substitute for board certification.*

Although this is our first occasion to address the credentialing provision of *N.J.S.A.* 2A:53A–41(a)(1), our interpretation here is consistent with our previous approach to the scheme set forth in *N.J.S.A.* 2A:53A–41. In *Ryan, supra,* a case primarily focused on the statute's waiver provision, we noted that the Patients First Act provides "more detailed standards for a testifying expert . . ., generally requiring the challenging expert be equivalently-quali-

---

[14] A board-certified expert must also satisfy one of two additional requirements. The physician must have devoted a majority of his professional time in the preceding year to either clinical practice in the specialty or to teaching at an accredited medical school in that specialty. *N.J.S.A.* 2A:53A–41(a)(2)(a), (b).

fied to the defendant." 203 *N.J.* at 52, 999 *A*.2d 427. In *Buck*, *supra*, we referred to *N.J.S.A.* 2A:53A–41(a) and (b) as setting forth three distinct categories embodying this "kind-for-kind rule":

(1) those who are specialists in a field recognized by the American Board of Medical Specialties (ABMS) but who are not board certified in that specialty;

(2) those who are specialists in a field recognized by the ABMS and who are board certified in that specialty; and

(3) those who are "general practitioners."

[207 *N.J.* at 389, 25 *A*.3d 240.]

We have viewed the Act as a framework in which only an equivalently credentialed specialist would be qualified to testify against another specialist. *See Ryan, supra,* 203 *N.J.* at 57–59, 999 *A*.2d 427.

Moreover, our interpretation of *N.J.S.A.* 2A:53A–41(a) is supported by *Lomando v. United States,* 667 *F*.3d 363, 382–83 (3d Cir.2011), which construed the hospital-credentialing provision and came to the same result as we have here. In *Lomando,* the plaintiff sued two physicians who were board certified in emergency medicine, but did not submit a report from an expert specializing or board certified in emergency medicine. *Id.* at 370. The United States Court of Appeals for the Third Circuit rejected the argument that if the plaintiff's expert were credentialed by a hospital to treat the condition at issue, the same-specialty requirement would not apply. *Id.* at 383. The Third Circuit reasoned that this Court has construed *N.J.S.A.* 2A:53A–41(a) "to require that an expert offering testimony against a board-certified specialist share that specialty *and* meet the requirements of either [*N.J.S.A.*] 2A:53A–41(a)(1) or–41(a)(2)." *Ibid.* (emphasis added). The federal appeals court—relying on *Ryan* and *Buck*—concluded "that the hospital credential provision of [*N.J.S.A.*] 2A:53A–41(a)(1) is an alternative to the board certification plus teaching or clinical practice requirements of [*N.J.S.A.*] 2A:53A–41(a)(2), but it is not an alternative to the specialization requirement of [*N.J.S.A.*] 2A:53A–41(a)." *Ibid.*

### E.

Plaintiffs ask us to find that "a physician credentialed by a hospital to treat patients for the medical condition ... that is the basis for the claim or action" need neither practice in the same medical specialty nor be board certified in that specialty. Plaintiffs' interpretation is at odds with the statute when viewed as a whole, our characterization of *N.J.S.A.* 2A:53A–41(a) in *Ryan* and *Buck*, and the Third Circuit's decision in *Lomando*.

Emergency medicine, family medicine, internal medicine, and preventive medicine are all distinct specialty areas recognized by the American Board of Medical Specialties. No one disputes that physicians practicing in all four of these specialty areas may treat carbon monoxide poisoning. However, there is no statutory exception—other than the waiver provision of *N.J.S.A.* 2A:53A–41(c)—that permits a physician specializing in internal and preventive medicine to serve as an expert witness against a physician specializing in emergency or family medicine, even though each is qualified to treat a patient for carbon monoxide poisoning. The waiver provision allows an alternative to the kind-for-kind specialty requirement if a plaintiff has made a good faith effort but failed to identify an expert physician in the specialty area available to testify. *See N.J.S.A.* 2A:53A–41(c).[15] Plaintiffs have not sought to invoke the waiver provision.

By plaintiffs' reckoning, so long as any hospital in the United States credentialed a physician to perform a particular procedure, regardless of whether that physician practiced in a particular

---

[15] *N.J.S.A.* 2A:53A–41(c) provides:

A court may waive the same specialty or subspecialty ... and board certification requirements of this section, upon motion by the party seeking a waiver, if, after the moving party has demonstrated to the satisfaction of the court that a good faith effort has been made to identify an expert in the same specialty or subspecialty, the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in, or full-time teaching of, medicine in the applicable area of practice or a related field of medicine.

ABMS specialty area, the physician would be qualified to testify against a board-certified physician in a medical specialty. As noted, that conclusion does not follow from a textual reading of the statute. It certainly is not consistent with the Sponsor's Statement to the bill that later became *N.J.S.A.* 2A:53A–41, which reads: "*an expert must have the same type of practice* and possess the same credentials, as applicable, as the defendant health care provider, unless waived by the court." Assembly Health and Human Services Committee, *Statement to Assembly Bill No. 50*, at 20 (Mar. 4, 2004) (emphasis added).[16] Plaintiffs' approach would render the same-specialty requirement meaningless.

Moreover, the logic of plaintiffs' argument would lead back to the days before passage of the Patients First Act when, in medical-malpractice cases, physician experts of different medical specialties, but who treated similar maladies, could offer testimony even though not equivalently credentialed to defendant physicians. *Khan, supra,* 200 *N.J.* at 100–01, 975 *A.2d* 389. Because most treating physicians are credentialed by a hospital, plaintiffs' interpretative analysis would read out of the statute the kind-for-kind specialty requirement.[17]

---

[16] The issue of whether an expert physician in one specialty should be able to testify against a physician in a different specialty was squarely before the Assembly Health and Human Services Committee. Offering testimony before the Committee, Dr. Clifford W. Toliver complained about medical-malpractice cases in which an "expert witness has never practiced for five, ten, fifteen years, or he's from out of state or, . . . they're not of your specialty. They're of another specialty and they're rendering an opinion in your specialty." *Public hearing before the Assembly Health and Human Services Committee: Testimony concerning issues and recommendations relating to health-care quality issues, the enhancement of patient safety, and medical error reduction,* 2002 Leg. 143 (Aug. 1, 2002) (Statement of Clifford W. Toliver, M.D.). We do not suggest that Dr. Toliver's testimony is in any way determinative of the issue before us.

[17] *See* Tex. Med. Assoc., *Confused, Frustrated, and Broke,* 107 *Tex. Med.* 20 (2010), *available at* http://www.texmed.org/template.aspx?id=19870 ("Most physicians (91 percent) have practice privileges at a hospital."); Michael A. Cassidy, *Hospital/Physician Relationships; Exclusive Credentialing and Contracting,*

The apparent objective of *N.J.S.A.* 2A:53A–41 is to ensure that, when a defendant physician is subject to a medical-malpractice action for treating a patient's condition falling within his ABMS specialty, a challenging plaintiff's expert, who is expounding on the standard of care, must practice in the same specialty. Plaintiffs have argued that an expert who has been credentialed by a hospital to render the same treatment is sufficiently qualified to testify. That may be true under *N.J.R.E.* 702. But hospital credentialing alone does not satisfy the requirements of *N.J.S.A.* 2A:53A–41. Our role is not to judge the merits or wisdom of the statute, but only to construe its meaning and to enforce it as intended by the Legislature.

We next apply *N.J.S.A.* 2A:53A–41 to the facts before us.

## IV.

"Under *N.J.S.A.* 2A:53A–41, the first inquiry must be whether a physician is a specialist or general practitioner." *Buck, supra,* 207 *N.J.* at 391, 25 *A.*3d 240. At the time they treated Nicholas at SJH Regional Medical Center for carbon monoxide poisoning in April 2005, Dr. Mynster was a specialist and board certified in emergency medicine, and Dr. Sehgal was a specialist and board certified in family medicine.

---

ALHA–Papers P07030233, 11 (July 3, 2002) ("For the vast majority of physicians, medical staff membership and privileges are as essential to practice medicine as a medical license; one simply cannot practice without them.... In most specialties, a physician without medical staff privileges will be unable to practice medicine in the geographic area—period."); NB Khan, Jr. & G. Schmittling, *Obstetric Privileges for Family Physicians: A National Study,* 8 *J. Am. Bd. Family Practice* 120, 120 (1995) (finding 87% of active members of the American Academy of Family Physicians had hospital admission privileges in 1993); Thomas C. Ricketts et al., *The Hospital and Medical Practice: A Study of Physician Staff Appointments Among Specialists and Generalists,* 18 *Health Servs. Research* 75, 75 (1983) (finding 89% of physicians in North Carolina had hospital privileges in 1978); *Guerrero v. Burlington Cnty. Mem'l Hosp.,* 70 *N.J.* 344, 355, 360 *A.*2d 334 (1976) ("[S]taff privileges for a member of the medical profession are essential to a viable medical practice.").

■ "[T]he second inquiry must be whether the treatment that is the basis of the malpractice action 'involves' the physician's specialty." *Ibid.* The treatment of carbon monoxide poisoning falls within the specialties of both Dr. Mynster and Dr. Sehgal. Emergency medicine "focuses on the immediate decision making and action necessary to prevent death or any further disability." *ABMS Member Boards, Emergency Medicine, supra.* "Family physicians deliver a range of acute, chronic and preventive medical care services." *ABMS Member Boards, Family Medicine, supra.*

When Nicholas arrived at the emergency room, Dr. Mynster treated him for carbon monoxide poisoning, ordering that he be given 100% oxygen and Ativan to address agitation and muscle cramping. This treatment squarely fell within the specialty of emergency medicine. As the attending physician, Dr. Sehgal consulted with Dr. Mynster, had Nicholas admitted into the hospital, and augmented his medications. This treatment likewise fell within the broad range of services rendered by family-medicine specialists. Because both defendants rendered treatment within their specialties, the equivalent-qualification rule applies. *N.J.S.A.* 2A:53A–41.

■ Plaintiffs' expert, Dr. Weaver, is board certified in internal medicine, with subspecialties in pulmonary diseases and critical care, and board certified in preventive medicine, with a subspecialty in undersea and hyperbaric medicine; he did not specialize in either emergency medicine or family medicine in April 2005 and has not since.

Dr. Weaver unquestionably is an expert in the treatment of carbon monoxide poisoning and the use of hyperbaric oxygen as a treatment modality. But in addition to the expert-witness qualifications required by *N.J.R.E.* 702, the Legislature has imposed the requirements set forth in *N.J.S.A.* 2A:53A–41. Dr. Weaver and Drs. Mynster and Sehgal practice in different ABMS specialties. The statute does not permit Dr. Weaver to testify about the standard of care exercised by a physician practicing in a different specialty. That Dr. Weaver is credentialed by a hospital to treat

carbon monoxide poisoning is a substitute for board certification in emergency and family medicine; it is not a substitute for specializing in those practice areas.

Because Dr. Weaver did not practice in the same specialty as either Dr. Mynster or Dr. Sehgal, the trial court erred in not barring his testimony. Plaintiffs filed an affidavit of merit prepared by an expert in emergency medicine, Dr. Doghramji, but did not offer him as an expert witness in this case. Plaintiffs never presented an expert in family medicine and never filed an affidavit of merit from a physician specializing in family medicine. Accordingly, at the summary-judgment stage, plaintiffs had no statutorily qualified expert who could render an opinion regarding the standard of care applicable to Drs. Mynster and Sehgal, much less whether they breached an applicable standard of care.

## V.

For these reasons, we reverse the trial court, enter summary judgment in favor of defendants, Drs. Mynster and Sehgal, and remand to the trial court for proceedings consistent with this opinion.

Chief Justice RABNER, Justices LaVECCHIA and HOENS, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in Justice ALBIN's opinion. Justice PATTERSON did not participate.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, RODRÍGUEZ (t/a) and CUFF (t/a)—6.

*Opposed*—None.