**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1338-23

STEVEN SHAW and MARTHA
SHAW, his spouse,

     Plaintiffs-Appellants,

v.

TK MANAGEMENT LLC,
MANUFACTURERS AND
TRADERS TRUST COMPANY
a/k/a M&T BANK,

     Defendants-Respondents.

_____

Argued April 9, 2025 – Decided July 10, 2025

Before Judges Currier and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-0757-21.

Timothy J. Foley argued the cause for appellants (Davis, Saperstein & Salomon, PC, and Foley & Foley, attorneys; David A. Drescher, of counsel and on the briefs).

Dennis S. Heffernan argued the cause for respondent Manufacturers and Traders Trust Company (Baxter &

Smith, PC, attorneys; Dennis S. Heffernan, on the brief).

PER CURIAM

Plaintiffs Steven Shaw (Shaw) and Martha Shaw[1] appeal from a September 25, 2023 order granting defendant Manufacturers and Traders Trust Company a/k/a M&T Bank (M&T) summary judgment and dismissing their complaint with prejudice.[2] Shaw also appeals from the November 20, 2023 order denying reconsideration. Because we conclude there are material facts in dispute regarding whether M&T owed a duty to Shaw, we reverse.

We derive the procedural history and facts from the motion record. Shaw filed a complaint alleging that "[o]n or about April 24, 2019, . . . [he] was lawfully" at an M&T branch. Shaw contends he used M&T's ladder which was defective, which caused him to fall and sustain severe personal injuries.

During the course of discovery, Shaw testified that he was a licensed electrician and the owner of Total Electric Incorporated. Shaw stated on April 24, 2019, he was working at an M&T branch as a subcontractor to A-1 Air Flow

---

[1] We refer to plaintiffs singularly as Shaw.

[2] Defendant TK Management LLC was previously dismissed from the case.

(A-1).  At the time of the accident, he had already been on the site "four or five" intermittent days.  A-1 coordinated the work.

Shaw noted he had performed work at this M&T branch for approximately eight years before the accident.  The work included "[w]iring repairs, outlet[] install[ation], [and] outside sign repairs."  He stated he "usually used [his] own equipment to do the job but [he] would use the branch's ladder."  The deposition transcript reveals the following exchanges regarding Shaw's use of M&T's ladder:

> Q.  When you would work, did you use your own equipment to perform that work?
>
> A.  I usually used my own equipment to do the job, but I would use the branch's ladder.
>
>    . . . .
>
> Q.  Now, would you request permission to use the ladder or would you just take it, or something else?
>
> A.  No, they never asked – you know I just used the ladder.  They never said anything about not using the ladder.  The bank people would say hey, yes, go ahead, use the ladder if you had to use it.  If you were there to use a ladder.
>
> Q.  So my question to you, is did you ask the bank people to use the ladder or did you just use the ladder[?]
>
> > [Shaw's Counsel]:  Are you talking about during this project or a general question?

A-1338-23

[M&T's Counsel]:  Just in general, prior to working on this particular project is what I want to know.

A.  Would I ask the bank employee[s] if I could use the ladder, is that what the question was?

Q.  That's correct, sir.

A.  After a long period of time working at the bank, you knew where the ladders were and you never had – there was never a question about that.  The bank employees would say use the ladders.

Q.  My question is specific.  Did you ever, in the time that you had been working at M&T . . . whatever branch you were going to, did you ever ask the bank employees if you could use the ladder?

A.  Yes.  I would say yes.

Q.  When was it that you had asked to use the ladder?

A.  When I first walked in the door.

Q.  Would you do that every time that you had walked in the door, or did you do it once and then, from then on, that was your practice and procedure, or something else?

A.  You know, if it was the first time that I was there, I would say can I use the ladder.  If I was going in and out a lot of times, I would just go grab the ladder.  It was never a question about – the bank would allow me to use their ladders all of the time.

Q.  When you say they would allow you to use the ladders, do you mean they didn't say hey, don't use the

4

A-1338-23

ladder, or do you mean you just used the ladder without an issue?

A. They would never say don't use their ladder. I mean, depending on where you were working at. If you're in a parking lot, way out, you know, it was sometimes more convenient to use their ladder.

. . . .

Q. . . . Did anyone ever at the bank specifically direct you to use their ladder instead of using your own ladder?

A. Yes. I was told sometimes there are ladders in the back, yes. They would say use our ladder. I don't know how the exact wording was, but, you know, you can use our ladder.

Q. . . . On the day of the accident, the ladder that you were using, who owned that ladder?

A. I guess the bank.

Q. With regard to the . . . branch, did you ever specifically ask anyone at the . . . branch, or [on] any other visits you made there prior to the date of the accident, if you could use their ladder?

A. No.

Q. How many times had you used that specific ladder before?

A. Plenty of times. Quite a few times. That particular job, quite a few times. Many times.

A-1338-23

Q. [B]efore you began this work with A-1 . . ., did you use that ladder?

A. Yes, I have.

Q. Approximately how many times where you began the project that you were working as a subcontractor for A-1 . . . had you used the ladder?

. . . .

A. Numerous times. Any time I went there, I would use the ladder there.

Q. . . . It's fair to say, that not every time you went to the . . . branch, a ladder was required, correct?

A. Correct.

Q. On the occasions that a ladder was required, did you ever use your own ladder while working at the . . . branch.

A. I can't recall. If I had to go on the roof, I would put up a taller ladder to go on the roof. Inside the branch itself, I would use their ladder.

Q. When you say many times, that you had used their ladder before this project with A-1 . . ., can you approximate how many times that is?

A. Over the years, many. To repair the lighting, you know, fixtures, I would use that ladder.

. . . .

Q. When you say with regard to the project that you were doing with A-1 . . ., did you use this particular

6

ladder that was involved in your accident during that project?

A. Yes, we did.

. . . .

Q. . . . On the day of the accident did you have any conversations with anyone from M&T . . . with regard to the use of the ladder?

A. No.

Q. On the day of the accident – at any time prior, while you were doing this job with A-1 during that four to five days you were there prior, did you have any conversations with anyone from M&T . . . with regard to the use of the ladder?

A. No.

On September 25, 2023, the trial court granted M&T's motion for summary judgment and dismissed Shaw's complaint with prejudice. In a nineteen-page written decision accompanying the order, the trial court determined that "M&T . . . did not owe a duty to" Shaw. The court found Shaw "was an independent contractor who was on the premises at the direction of A-1" and "M&T . . . did not have any supervisory or direct control over [Shaw]'s work because [he] received instructions directly from . . . A-1."

Moreover, the trial court stated Shaw had "the requisite experience necessary to inspect the equipment that he intend[ed] to use for any deficiencies

7

or potential dangers." The court found Shaw "inspected this ladder 'four or five days before the fall' and did not find any issues with the ladder." Further, he "continued to use this ladder 'quite a few times' on that particular job without finding deficiencies or potential dangers."

In addition, the trial court distinguished our holding in Sanna v. National Sponge Company, 209 N.J. Super. 60 (App. Div. 1986), by finding "M&T . . . did not directly participate in the furnishing of the ladder to . . . Shaw." The court noted "Shaw himself admit[ted] that he took and used the ladder from the premises without the knowledge or consent of M&T." The court stated M&T's "control over the ladder [wa]s not enough to hold M&T . . . liable." Instead, the court said "[t]he Sanna court is clear that defendant must directly participate in the manner of work. . . . that was not the case here."

On November 20, 2023, the trial court denied Shaw's motion for reconsideration. The court found Shaw "failed to set forth a justifiable reason for th[e c]ourt to reconsider the September 25 [o]rder." The court found Shaw's reliance on Alloway v. Bradlees, Incorporated, 157 N.J. 221 (1999) was "inappropriate" because Shaw raised Alloway "for the first time in [the] motion for reconsideration." Moreover, the court found Shaw's attempt to "impose liability on M&T based on the close relationship between . . . Shaw and M&T,"

was not persuasive. Therefore, the court concluded that Shaw's attempt "to establish a new category that would impose liability on a landowner for injuries sustained by independent contractors" failed.

On appeal, Shaw argues the trial court erred because it "made numerous determinations of fact that were not undisputed on the record presented." Shaw contends specifically that "the court concluded that 'M&T . . . did not directly participate in the furnishing of the ladder to . . . Shaw'" and "Shaw 'took and used the ladder from the premises without the knowledge or consent of M&T.'"

However, Shaw asserts "[t]he record reflects . . . that . . . [M&T] representatives were fully aware and complicit with the use of the ladder by" him and others. Further, he notes his "testi[mony] that he was expressly given permission to use the ladder in the branch." Shaw argues the trial court impermissibly drew factual inferences in favor of M&T rather than him.

In addition, Shaw asserts the court should have found M&T had a duty under Alloway. Further, any argument that M&T did not have "notice that the ladder was defective so it could not be liable if the defect resulted in injury" should be disregarded because M&T was "deemed aware of defects that are known or that should be known based on a reasonable inspection."

 A-1338-23

M&T counters that "the trial [c]ourt correctly found that [it] . . . had no legal duty to [Shaw] to ensure his safety on the subject ladder where M&T . . . did not direct [Shaw] to use the subject ladder."  M&T argues "[m]ost significantly, defendant M&T . . . never 'supplied' or 'provided' any work tools, equipment, instruction, or supervision to [Shaw], and [Shaw] brought all of his own materials, including multiple ladders."  In addition, M&T asserts:

> [B]y [Shaw]'s own admission, he would sometimes elect to use the on-site ladder that was stored in the utility room of the branch simply out of convenience. . . . This ladder was permanently on[-]site for use by the M&T maintenance crews, because outside vendors typically brought their own ladders and equipment. . . . By [Shaw]'s own admission, no employee of M&T ever required or instructed [him] to use the M&T ladder, especially where [he] had brought his own ladders to his work sites.

Further, M&T contends "even if [it] had such a duty, which it did not, M&T did not breach such duty" because Shaw's "accident occurred on a ladder that he chose to use, that he had used on multiple prior occasions without incident including the same day of the accident, and that had no defects upon inspection, by [Shaw]'s own admission."

M&T contends we should "wholly disregard [Shaw]'s arguments concerning [it]s alleged breach under general negligence principles based on the holding in Alloway."  M&T notes Shaw's Alloway argument was "newly raised"

10

on reconsideration. In addition, M&T argues that Shaw's arguments regarding M&T's duty to inspect the ladder is raised "for the first time on appeal which is improper and should not be considered by this [c]ourt."

We review the grant of summary judgment de novo, applying the same legal standards as the trial court. Green v. Monmouth Univ., 237 N.J. 516, 529 (2019). Under Rule 4:46-2(c),

> [t]he judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.

"The factual findings of a trial court are reviewed with substantial deference on appeal, and are not overturned if they are supported by 'adequate, substantial and credible evidence.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (quoting Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 293 (2001)).

Allegations are not enough to defeat summary judgment; the non-moving party "must produce sufficient evidence to reasonably support a verdict in its

11

favor." Invs. Bank v. Torres, 457 N.J. Super. 53, 64 (App. Div. 2018), aff'd and modified by 243 N.J. 25 (2020).  Further, "[b]ald assertions are not capable of . . . defeating summary judgment."  Ridge at Back Brook, LLC v. Klenert, 437 N.J. Super. 90, 97-98 (App. Div. 2014) (citing Puder v. Buechel, 183 N.J. 428, 440-41 (2005)).

"If there is no genuine issue of material fact, we must then decide whether the trial court correctly interpreted the law."  DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013).  We review issues of law de novo and accord no deference to the trial judge's conclusions of law.  See Nicholas v. Mynster, 213 N.J. 463, 478 (2013).  "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"Summary judgment should be granted . . . 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

"To prevail on a claim of negligence, a plaintiff must establish four elements: (1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." Fernandes v. DAR Dev. Corp., Inc., 222 N.J. 390, 403-04 (2015). "[W]hether a defendant owes a legal duty to another" is "generally [a] question[] of law for the court to decide." Robinson v. Vivirito, 217 N.J. 199, 208 (2014). "The inquiry should be fact-sensitive . . . ." Lechler v. 303 Sunset Ave. Condo. Ass'n, 452 N.J. Super. 574, 583 (App. Div. 2017).

"As a general rule, a landowner has a non-delegable duty to use reasonable care to protect invitees against known or reasonably discoverable dangers." Accardi v. Enviro-Pak Sys. Co., Inc., 317 N.J. Super. 457, 462 (App. Div. 1999) (quoting Dawson v. Bunker Hill Plaza Assocs., 289 N.J. Super. 309, 317 (App. Div. 1996)). "[T]his general rule operates to protect individuals performing work on the premises of the landowner, most commonly independent contractors and their employees." Ibid.

However, "[i]t is equally well-settled that the 'landowner is under no duty to protect an employee of an independent contractor from the very hazard created by doing the contract work.'" Id. at 463 (quoting Dawson, 289 N.J. Super. at 318); see also Muhammad v. N.J. Transit, 176 N.J. 185, 198 (2003).

"This exception is carved out of the landowner's general duty to protect his invitees because the landowner may assume that the independent contractor and her employees are sufficiently skilled to recognize the dangers associated with their task and adjust their methods accordingly to ensure their own safety." Accardi, 317 N.J. Super. at 463.

However, the "exception to the landowner's general duty of care is not absolute where the landowner retains a duty to exercise reasonable care for work involving independent contractors." Ibid. A landowner has a duty to an independent contractor "where the landowner retains control over the 'manner and means of the doing of the work which is the subject of the contract.'" Ibid. (quoting Dawson, 289 N.J. Super. at 318); see also Muhammad, 176 N.J. at 198.

Therefore, a landowner "may implicate [themselves] in negligence for injuries to the employees of the subcontractor related to the manner in which the work is performed or to the furnishing of defective equipment." Wolczak v. Nat'l Elec. Prods. Corp., 66 N.J. Super. 64, 73 (App. Div. 1961); see Izhaky v. Jamesway Corp., 195 N.J. Super. 103, 106-107 (App. Div. 1984) (cannot "ignore[] the instruction of Wolczak that active interference of the owner in the manner of doing the work may implicate him in negligence for injuries to the

employees . . . related . . . to the . . . furnishing of defective equipment" (citation omitted)).

In Sanna, the plaintiff, an employee of an independent contractor, "was injured when a makeshift scaffold collapsed" in the landowner's factory. 209 N.J. Super. at 62. The independent contractor worked on the site "[f]or about five years before" plaintiff's accident. Ibid. "During those years, plaintiff occasionally worked . . . at [the] factory." Ibid. The landowner "would lend [the independent contractor] the necessary equipment, if it was available." Ibid. On the date of plaintiff's injury he

> and his co-worker arranged a scaffold. This scaffold was constructed from an aluminum ladder (dismantled in two parts), supplied by [the independent contractor], and a forklift and some planks supplied by [the landowner].
>
> . . . .
>
> This arrangement "worked out real fine." After plaintiff worked with this scaffold arrangement for about an hour, an employee of [the landowner] removed the borrowed forklift because he needed it immediately for another task. Plaintiff then told an employee of [the landowner] that he needed another ladder to finish the job. [The landowner]'s employee loaned plaintiff a wooden ladder which plaintiff used in place of the forklift in the scaffold arrangement. This ladder-scaffold arrangement was "shaky" and not as secure as the forklift setup.

> About an hour after plaintiff began working upon the new scaffolding arrangement, it collapsed causing him to fall and severely injure his left arm.
>
> [Id. at 63.]

We noted there was "strong[] evidence . . . to show that the [landowner] assumed the duty of furnishing or assisting in furnishing a secure scaffold." Id. at 69. Further, "[i]f [the landowner] had done nothing and plaintiff's employer . . . had assumed sole control over the ladders and scaffolding . . . plaintiff would have no case against" the landowner. Ibid. However,

> [o]nce [the landowner] undertook to supply parts of [a] scaffolding, especially in view of the past relations of [the landowner] and [the independent contractor] where [the landowner] frequently provided equipment to its contractor, . . . a jury could find that defendant exercised the requisite control over the jobsite to create a liability exposure.
>
> [Id. at 68.]

Here, we conclude summary judgment as to M&T's duty was erroneously granted. M&T overstates that it "never 'supplied' or provided [Shaw with] any work tools, [or] equipment" and that Shaw "brought all of his own materials." In fact, Shaw testified that "[t]he bank employees would say use the ladders"; "the bank would allow [him to] use their ladders all of the time"; and he "was told sometimes there are ladders in the back . . . . They would say use our

16

ladder." Giving Shaw all reasonable factual inferences, there is a material fact in dispute as to whether M&T supplied or provided Shaw a ladder. As in <u>Sanna</u>, <u>if M&T undertook to supply the ladder it had a duty to Shaw.</u>

Moreover, in <u>Sanna</u>, we paid special attention to "the past relations" of the landowner and the independent contractor where the landowner "frequently provided equipment." 209 N.J. Super. at 68. Similarly, Shaw's years of working at the M&T site and his testimony that M&T permitted him to use its ladder through the years creates a material dispute of fact regarding M&T's duty, if any. In this respect, the trial court's focus, solely on the day of Shaw's accident, was too restricted.

We emphasize our opinion is narrow. We only conclude there was sufficient evidence for Shaw to defeat summary judgment on the issue of duty. Shaw must still establish the remaining elements of negligence, and as suggested by the trial court, contend with any issues concerning his comparative negligence, if any. Given our determination, we need not reach the parties' belated arguments regarding the application of <u>Alloway</u> or M&T's duty to inspect.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1338-23