**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2660-23

EAST RUTHERFORD TWO,
LLC,

      Petitioner-Appellant,

v.

NEW JERSEY SPORTS AND
EXPOSITION AUTHORITY,

      Respondent-Respondent.

_____

Argued December 16, 2025 – Decided January 8, 2026

Before Judges Firko and Vinci.

On appeal from the New Jersey Sports and Exposition Authority.

Neil Yoskin argued the cause for appellant (Cullen & Dykman, LLP, attorneys; Neil Yoskin, of counsel and on the brief; Zachary A. Klein, on the briefs).

Charlie A. Stegner-Freitag, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Charlie A. Stegner-Freitag, on the brief).

PER CURIAM

Appellant East Rutherford Two, LLC (ER2) appeals from a March 28, 2024 final agency decision issued by respondent New Jersey Sports and Exposition Authority (NJSEA) denying a zoning certificate and consistency determination for a proposed multi-family building—The Monarch—on a property located on Route 3 in East Rutherford. We affirm.

I.

By way of background, in 1968, the Hackensack Meadowlands District (the District) was created under the Hackensack Meadowlands Reclamation and Development Act (the 1968 Act), N.J.S.A. 13:17-1 to -86, to control indiscriminate dumping and rampant, uncoordinated development in the Meadowlands area. The 1968 Act assigned the local planning and zoning powers of fourteen municipalities in Bergen and Hudson Counties to a state agency, the Hackensack Meadowlands Development Commission (HMDC).

In 1971, NJSEA was created to manage sports and entertainment facilities in this State. In 1972, HMDC adopted a Master Plan, N.J.S.A. 5:10A-10, which included a large-scale vision for the development of the District in specially planned areas. In 2001, HMDC was renamed the New Jersey Meadowlands

2

Commission (NJMC). In 2015, the Legislature dissolved NJMC and vested NJSEA with NJMC's powers, authorities, and purposes. N.J.S.A. 5:10A-6.

NJMC, and later NJSEA (following the statutory merger in 2015), was charged with the preparation and regular revision of the Master Plan to regulate development and protect the region's environmental resources. The Master Plan was revised in 2004 (the 2004 Master Plan) and 2020 (the 2020 Master Plan). Both Plans identify one of the District's primary goals as the preservation and restoration of wetlands and other natural resources, with a focus on balancing environmental and developmental needs. The Plans also provide that specific areas within the District may be the subject of redevelopment plans, which function as overlay zoning to facilitate orderly development in areas formally designated as "in need of redevelopment."

On November 24, 2003, the Route 3 East Redevelopment Area, covering approximately 42.85 acres on the south side of Route 3 in East Rutherford, was designated as an area "in need of redevelopment" after investigation revealed the area remained vacant for years due to environmental constraints and limited access. In January 2004, the Route 3 Redevelopment Plan was adopted. It described the area as containing substantial wetlands and explicitly stated as its goal "to allow development of the upland portion of the subject properties with

3

minimal to no impact to the existing wetlands." The Route 3 Redevelopment Plan called for "less intensive development," directed growth to available uplands, and required applicants to delineate wetlands, prepare alternatives analyses, and secure necessary state and federal approvals for any proposed wetland disturbance.

The subject property (the Property), Block 108.04, Lot 5.01, located in East Rutherford, totals approximately 25.9 acres. A majority of the Property is characterized as wetlands, with a smaller upland portion adjacent to the Route 3 East Service Road. The site is directly west of a previously approved and completed multi-family development, The Monarch.

In 2004, NJMC approved a zoning certification for The Monarch, which was to include 614 rental units between two twenty-story multi-family residential high-rises, with each building having 307 rental units. The development footprint was on a 4.25-acre portion of the larger tract, which necessitated the fill of 0.898 acres of wetlands. NJMC determined that the amount of wetlands—0.898 acres—to the mostly uplands development—3.352 acres—struck the appropriate balance between environmental preservation and land use development goals for the region as per the Master Plan and the Route 3 Redevelopment Plan. The Monarch subsequently received a conditional

A-2660-23

zoning certificate from NJMC as well as the necessary permits from the New Jersey Department of Environmental Protection (NJDEP) and the United States Army Corps of Engineers (USACE).

In October 2011, The Monarch development was amended to reduce the structure's height to a five-story midrise apartment complex with only 316 rental units. The amended proposal did not change the development footprint, only the buildings themselves. The original and amended Monarch development did not indicate that the location was slated for a second development phase or a nearby building. Because the conditions of the previous approval did not change, The Monarch received the conditional zoning certificate as well as all the necessary permits and was subsequently constructed with the amended 316 rental units.

On March 23, 2016, ER2, which had acquired an interest in the remaining undeveloped portion of Lot 5.01, initiated plans to construct a second-phase multifamily development. The proposed development consisted of a 197-unit, mid-rise building, with 10% of units reserved for affordable housing, on a 3.28-acre building footprint, of which roughly 2.62 acres were wetlands and would require wetland fill.

A-2660-23

Because the property lies within the District and the proposed development would impact wetlands, ER2 submitted its proposal to the USACE, as required by section 404 of the Federal Clean Water Act (Clean Water Act), 16 U.S.C. § 1344. On May 17, 2016, plaintiff applied to NJDEP for a Water Quality Certificate (WQC) approval, required by section 401 of the Clean Water Act, 16 U.S.C. § 1341. ER2's application to NJDEP included extensive environmental, site, and planning assessments. Under a prior memorandum of agreement between NJDEP and NJMC, NJSEA is required to determine consistency with the Master Plan and other adopted NJMC documents before NJDEP can issue a WQC.

On May 31, 2016, USACE published a notice of ER2's proposed development and requested public comments. The United States Environmental Protection Agency (EPA), the National Oceanic and Atmospheric Administration (NOAA), and the United States Fish and Wildlife Service (USFWS) all objected to the proposed development and recommended that the USACE deny the permit application.

On September 19, 2016, NJDEP denied ER2's WQC application, concluding the Project did not meet the minimization and alternatives analysis required for wetland impacts under the Coastal Zone Management rules,

6

N.J.A.C. 7:7-9.27, and the Freshwater Wetlands Protection Act rules, N.J.A.C. 7:7A-4. On October 6, 2016, ER2 filed an administrative hearing request challenging NJDEP's denial of the WQC. Both parties agreed to participate in NJDEP's Alternative Dispute Resolution (ADR) program. On October 13, 2016, the USACE denied plaintiff's section 404 wetlands fill permit application without prejudice after it became aware of NJDEP's denial of the WQC. Through ADR, ER2 provided supplemental materials, including a detailed alternatives analysis and planning review, which NJDEP ultimately accepted, contingent upon ER2 obtaining a statement of consistency with the Master Plan from NJSEA.

On November 2, 2017, ER2 requested a consistency determination from NJSEA for the Project. On November 24, 2017, NJSEA recommended that NJDEP issue a determination that the Project was inconsistent with the New Jersey Coastal Zone Management Program (CZMP). NJSEA's determination emphasized that "[a] principal goal of the . . . Master Plan is to preserve and enhance wetlands and other valuable natural resources. The . . . [District] is planned to permit uses consistent with the preservation of open space and habitat protection and enhancement in the District." NJSEA also stated that "[a]lthough multifamily residential uses are permitted uses within the redevelopment plan,

the plan specifically states that 'the goal of the redevelopment plan is to allow development of the upland portion of the subject properties with minimal to no impact to existing wetlands.'" NJSEA ultimately found "[t]he scope of the [P]roject, including the location of the proposed development footprint and the placement of [the] fill within the delineated environmentally[-]sensitive wetlands contained on the site[,] is not consistent with the goals and objectives for development in the . . . [D]istrict."

On January 3 and 24, 2018, ER2 wrote to NJSEA seeking reconsideration of its decision. On March 14, 2018, NJSEA reaffirmed its finding that the Project "is not consistent with the . . . Master Plan, which serves as an element of the State's [CZMP]."

On August 9, 2018, ER2 and NJDEP agreed to a term sheet, which reaffirmed the October 25, 2017 agreement and stated the parties "agreed to enter into a settlement agreement contingent upon receipt of a determination from [NJSEA] that the . . . [P]roject is consistent with the . . . Master Plan."

On July 29, 2020, ER2 submitted a revised application to NJSEA for a zoning certificate and consistency determination reflecting a reduced wetland of 1.8 acres of wetlands, which was a reduction of 0.82 acres from the original 2.62 acres of wetlands. The development still had 3.28 acres of land, but the rental

units were reduced to 170 from the original 197 rental units. On January 26, 2021, NJSEA issued a recommendation to NJDEP, in which it stated that the scope of the project is not consistent with the Master Plan. NJSEA recommended NJDEP issue a determination that the Project was "not consistent with the State's CZMP." On January 27, 2021, NJSEA notified ER2 by letter of its recommendation to NJDEP. In its letter, NJSEA stated:

> The current application for a zoning certificate proposes a 170-unit residential development on the subject property. As part of this proposal, 1.8 acres of wetlands fill is proposed on a lot containing 0.6 acre[s] of uplands, of which only 0.05 acre[s] [are] utilized within the development footprint. While the footprint of the residential project has been slightly reduced from the 2017 proposal . . . , our review of the subject application indicates no difference to the substantive basis of . . . NJSEA's evaluation that would affect the agency's determination . . . .
>
> It is noted that this current application essentially proposes to create a buildable footprint by filling three times the number of wetland acres than the existing number of uplands acres on the site. This furthermore stands in marked contrast to the 2004 [c]oastal [z]one [c]onsistency recommendation issued for the pre-subdivided property, which recognized that the filling of 0.898 acres of a 4.25-acre development footprint in order to "square off" an existing development footprint consisting primarily of uplands struck the appropriate balance between the environmental preservation and land use development goals for the region as established in the . . . Master Plan.

9

On February 10, 2021, ER2 filed an appeal from the recommendation with NJSEA. On March 25, 2021, NJSEA transmitted the case to the Office of Administrative Law. The parties agreed that the dispute was legal rather than factual and presented a joint stipulation of facts and exhibits for summary judgment disposition.

On November 14, 2023, the Administrative Law Judge (ALJ) granted NJSEA's motion for summary judgment and denied ER2's motion for summary judgment. In her decision, the ALJ reasoned:

> To be sure, . . . NJSEA's determination, in part, evaluates whether the use of coastal and marine resources is consistent with the State's CZMP. . . . Further, . . . NJDEP and NJSEA had to consider the impact on protected wetlands in their determinations. Still, . . . NJSEA must primarily decide the development's consistency with the . . . Master Plan, [CZMP], and area redevelopment plan under different standards than . . . NJDEP. N.J.S.A. 5:10A-13; N.J.S.A. 13:17-12, -14; See also N.J.S.A. 5:10A-19; 13:17-20, -21; N.J.A.C. 19:3-5.9; N.J.A.C. 19:4-5.123. Simply because . . . NJDEP determined the project would not "destroy, jeopardize, or adversely modify" the existing habitat of the development area, this does not mean that the proposed development was consistent with the goal of upland development with "minimal to no impact" on the wetlands.
>
> In recognition of their differing obligations and prior agreement, . . . NJDEP deferred to . . . NJSEA, making its agreement to issue the WQC to [ER2] contingent on . . . NJSEA's development plan

10

consistency decision. . . . NJDEP's contingent WQC approval, based on standards of the [Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-10 (Freshwater Act)], does not dictate . . . NJSEA's determination of whether ER2's proposed development is consistent with the . . . Master Plan and area redevelopment plans.

. . . .

Undeniably, "the goal of the redevelopment plan is to allow development of the upland portion of the subject properties with minimal to no impact to the existing wetlands." . . . . Notably, . . . NJMC's zoning regulations point to the "most recent edition of Merriam-Webster's Collegiate Dictionary" to determine the meaning of words that carry no regulatory definition. N.J.A.C. 19:4-2.1(d). That dictionary defines "minimal" as "relating to or being a minimum," such as "the least possible," "barely adequate," or "very small or slight." Minimal, Merriam-Webster, https://www.merriam-webster.com/dictionary/minimal (last visited October 31, 2023). Further, because the governing regulations do not define what constitutes minimal, . . . NJSEA can flexibly assess development and other requirements under the . . . Master Plan and the CZMP and its rules. See Cammarata v. Essex Cnty. Park Comm'n, 26 N.J. 404, 410 (1958) (noting that regulation promulgation provides "flexible control in areas where the diversity of circumstances and situations [it may encounter] forbids the enactment of legislation as a whole").

Therefore, if there is any ambiguity as to the meaning of "minimal," one only needs to look at the redevelopment plan's stated goal of developing upland portions with, at most, minimal impact on wetlands. Simply put, [ER2's] argument that the Master [Plan] or

11

> [Route 3] [R]edevelopment [P]lan's failure to define minimal is not fatal to . . . NJSEA's consistency denial. . . . NJSEA considered "minimal" in an ordinary and common-sense meaning. DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citations omitted) (courts will "ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions . . . to give sense to the legislation anticipating every possible problem which may arise and providing for its solution").

The ALJ also found "unavailing" ER2's reliance on a Project Impact Assessment because NJSEA did not deny the application because of the wetland fill itself, but on the basis the development footprint "included minimal uplands" and "significant filling of environmentally sensitive wetlands." The ALJ pointed out "simple math" supports NJSEA's conclusion that "more than half the development footprint encompasses wetland disturbance." The ALJ concluded ER2 failed to establish that NJSEA's determination was arbitrary, capricious, or unreasonable.

ER2 filed exceptions to the ALJ's initial decision maintaining the word "minimal" is undefined and that the proposed wetland disturbance would be "very small." On March 28, 2024, NJSEA issued a decision adopting the ALJ's initial decision as its final decision on the Project. This appeal followed.

Before us, ER2 argues NJSEA's conclusion that ER2's application is inconsistent with the Master Plan and is arbitrary, capricious, unreasonable, and

incorrect as a matter of law. ER2 contends NJSEA's decision is not consistent with the plain meaning of the phrase "no or minimal impact" in the Master Plan. ER2 also challenges NJSEA's decision on the basis it is inconsistent with NJDEP's conclusion and NJSEA permitting precedent. In the alternative, ER2 seeks a remand for a plenary hearing to clarify and supplement the administrative record with respect to "mixed questions of law and fact" that are material to this dispute and not previously addressed.

II.

As an appellate court, our scope of review of a decision made by an administrative agency is limited. Russo v. Bd. of Trs., PFRS, 206 N.J. 14, 27 (2011). We are bound to uphold an agency's quasi-judicial decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Ibid. (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). The Supreme Court established the following "three channels of inquiry" to guide our appellate review:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

13

[Herrmann, 192 N.J. at 28 (citing Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

Of particular relevance here, appellate courts should "accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing." GE Solid State, Inc. v. Dir. Div. of Tax'n, 132 N.J. 298, 306 (1993). We also apply an enhanced deferential standard of review when the agency's decision involves "predictive or judgmental determinations" that implicate the agency's administrative expertise. In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 389 (2013).

When we construe a statute, we give the words used by the Legislature "their ordinary meaning and significance" and read all the relevant parts together "to give meaning to the whole of the statute." Nicholas v. Mynster, 213 N.J. 463, 480 (2013). If reading the plain language of the statute "leads to a clear and unambiguous result, then the interpretive process is over." TAC Assocs. v. New Jersey Dept. of Env't Prot., 202 N.J. 533, 541 (2010). This approach allows us to "construe the statute sensibly and consistent with the objectives that the legislature sought to achieve." Nicholas, 213 N.J. at 480. We reverse an agency's determination only when it "flout[s] the statutory language and undermine[s] the intent of the legislature." GE Solid State, 132 N.J. at 306.

14

Pursuant to N.J.S.A. 5:10A-11(a), a constituent municipality located within the District that adopts NJSEA's "master plan, zoning regulations, codes, and standards shall review and approve or reject applications for the development, improvement, redevelopment, construction, or reconstruction on land in the [D]istrict." Although certain municipalities retain the authority to approve or deny these applications, NJSEA may assert "sole jurisdiction over any project it deems, in its sole discretion, to be vital to the public safety, general welfare, development, or redevelopment of the [D]istrict." N.J.S.A. 5:10A-11(f) (emphasis added). The Legislature defined "project" as "any application for development, plan, work, or undertaking [NJSEA], constituent municipality, or redeveloper, pursuant to the master plan or a redevelopment plan." N.J.S.A. 5:10A-3(2).

III.

First, ER2 argues a plain language analysis of the phrase "minimal to no impact" reveals that the proposed Project is consistent with both the Route 3 Redevelopment Plan and thus, the Master Plan. In the event this court finds this phrase to be ambiguous, ER2 maintains the intent and purpose of the Route 3 Redevelopment Plan and the Master Plan yields the same conclusion. We are unpersuaded.

15

Here, the words "minimal to no impact" are derived solely from the Route 3 Redevelopment Plan, which states in pertinent part:

> Review of the original NJMC Master Plan reveals that the drafters were of the opinion that [the] Route 3 Service Road Area would be part of the Berry's Creek Business and Cultural Center. However, the vision of the original drafters of the [M]aster [P]lan never fully materialized as the area has remained essentially open space with exception of the Sheraton Hotel, Homestead Villages, and MetroMedia Office Building further east along the Route 3 Service Road. The subject area has remained undeveloped for over [thirty] years since the inception of the District's original [M]aster [P]lan.
>
> The goal of the redevelopment plan is to allow development of the upland portion of the subject properties with <u>minimal to no impact to the existing wetlands</u>. Given the sensitivity of the environment, a less intensive development that addresses the wetland conditions of these properties would be more appropriate for the redevelopment area.
>
> [NJMC]'s objective for this redevelopment area is to encourage positive development of the area that will contribute to the economy and environment. This redevelopment plan will obtain a public objective of creating orderly development while protecting the public health, safety and welfare.
>
> [(Emphasis added).]

The phrase "minimal to no impact," articulated in the Route 3 Redevelopment Plan must be given its ordinary and common sense meaning, as required by well-established principles of statutory interpretation. See Nicholas,

16

213 N.J. at 480 (holding courts give statutory terms their "ordinary meaning" and interpret provisions holistically). Where the language is clear and unambiguous, our interpretive inquiry is at an end. See TAC Assocs., 202 N.J. at 541.

Here, the ordinary and plain meaning of "minimal" is "relating to or being a minimum" or "the least possible; barely adequate; very small or slight." See minimal, Merriam-Webster, https://www.merriam-webster.com/dictionary/minimal (last visited December 31, 2025). Applying this definition, the Route 3 Redevelopment Plan unmistakably instructs that only those development activities which result in, at most, a very small or slight disturbance of existing wetlands may be considered consistent with the Master Plan.

NJSEA's determination was consistent with both the letter and the spirit of the Route 3 Redevelopment Plan as well as the Master Plan. Moreover, NJSEA not only found any wetland fill was fatal to a development application, but that ER2's proposal—which entailed filling 1.8 acres of wetlands for a total project footprint of just 3.28 acres—exceeded the "minimal" threshold, especially in light of the small fraction of available uplands and the Master

Plan's strong preference for the "development of the upland portion" with only "minimal to no impact" on wetlands.

Furthermore, NJSEA's reading is reinforced by the structure and intent of the Route 3 Redevelopment Plan, which expressly recognizes the "sensitivity of the environment" and contemplates only "less intensive development" that "addresses the wetland conditions."  We note this focus on environmental preservation is a consistent thread running throughout the applicable governing statutory and regulatory framework, as well as the 2020 Master Plan, which highlights floodplain and wetlands preservation is especially critical in the Meadowlands, a particularly vulnerable location for sea level rise and flood events.

ER2's contention that "minimal" should instead be construed as "the least possible [impact] in light of the [P]roject's purpose"—an approach ER2 argues is drawn from the Freshwater Act, N.J.S.A. 13:9B-10—misinterprets the context and legal regime governing NJSEA's consistency determination.  Nothing in the Master Plan or the Route 3 Redevelopment Plan invokes that standard.  Rather, NJSEA imposes its own, more protective policy as contemplated by the Legislature's prerogative and the agency.  See In re Proposed Xanadu Redevelopment Project, 402 N.J. Super. 607, 632 (App. Div. 2008).  Essentially,

ER2 posits no proposed development would violate the wetlands restriction as long as it does not create a larger impact than necessary. In plain terms, that is not what was intended.

In sum, NJSEA's decision to reject the proposed development as inconsistent with the Route 3 Redevelopment Plan and Master Plan does not "flout the statutory language and undermine the intent of the Legislature," but rather faithfully implements it. GE Solid State, 132 N.J. at 306-07. NJSEA's analysis focused not on the mere fact of wetlands fill (which can be permitted under certain circumstances even consistent with the Master Plan), but on the relative magnitude of wetland disturbance compared to the extent of upland available. NJSEA properly evaluated whether the proposed development would create a "buildable footprint by filling three times the number of wetland acres than the existing number of upland aces on the site," in "marked contrast" to previously approved projects, which involved only 0.898 acres of wetlands out of a 4.25-acre footprint (21%) being disturbed. In contrast, the current proposal required filling 1.8 acres of wetlands for a 3.28-acre development footprint— and thus was determined to exceed the "minimal" threshold articulated in the redevelopment plan.

A-2660-23

The critical distinction—and the legal justification for NJSEA's decision—rests on the recognition that NJSEA is not bound to apply the standard used when NJDEP typically issues WQCs under section 401 of the Clean Water Act when NJSEA undertakes the Master Plan consistency review. NJSEA's project review incorporates different considerations than NJDEP's decision to issue a WQC, including:

> (1) the use of land and buildings, residential, commercial, industrial, park, and other like purposes;
>
> (2) service-water supply, utilities, sewerage, and other like matters;
>
> (3) transportation, streets, parking, public transit lines and stations, both above and below ground level, freight facilities, airports, harbors, channels, docks, and wharves, and other like matters;
>
> (4) housing, including affordable housing, residential standards, clearance, redevelopment, rehabilitation, conservation, and other like matters;
>
> (5) water, soil conservation, flood control, and other like matters;
>
> (6) public and semipublic facilities including but not limited to civic centers, schools, libraries, parks, playgrounds, fire houses, police buildings, hospitals, and other like matters;
>
> (7) the distribution and density of population;
>
> (8) planned unit development;

(9) community appearance;

(10) financing and programming capital improvements;

(11) plan and develop facilities for tourism, sports, and entertainment; and

(12) other related elements of growth and development, including the social implications of any proposed development, and advances in technology related to any subject included in the plan.

[N.J.S.A. 5:10A-10(e).]

Although NJDEP, applying its own distinct wetlands regulatory standards, ultimately concluded that the project could proceed consistent with water quality requirements contingent on NJSEA's approval, NJSEA's independent review duly focused on policy goals prescribed in the Master Plan and Route 3 Redevelopment Plan. In other words, NJSEA's task was to determine consistency with planning and zoning policy, not compliance with environmental permitting standards.

NJSEA's decision explicitly articulated its independent planning policy rationale, tied directly to the controlling statutes, regulations, the Master Plan, and Route 3 Redevelopment Plan. NJSEA's conclusion that the scale of wetland disturbance in plaintiff's proposal exceeded the scope of "minimal to no impact" contemplated by the Master Plan, and that this justification was distinct from,

21

and not overridden by, NJDEP's water quality certification. In short, NJSEA did not act arbitrarily, capriciously, or unreasonably.

IV.

We reject ER2's argument that NJSEA acted arbitrarily in denying its proposal because nearby developments—specifically the American Dream project—were approved despite also impacting wetlands. The key distinction lies in the specific environmental context and the degree of wetlands impact for each project. For example, The Monarch proposal, a prior approved project on adjacent property, involved only 0.989 acres of wetlands fill within a larger 4.25-acre upland footprint, a disturbance that was considered "minimal" in light of the Route 3 Redevelopment Plan.

In contrast, ER2's current project would create its entire building footprint by filling 1.8 acres of wetlands on a site having less than an acre of available uplands, amounting to "filling three times the number of wetland acres than the existing number of uplands on the site." NJSEA found this degree of impact went well beyond the "very small or slight" disturbance contemplated by the "minimal to no impact" standard and was thus reasonably rejected by NJSEA as inconsistent with its permitting and planning precedent.

A-2660-23

ER2's contention that NJSEA's decision is inconsistent with its post approval of the American Dream project is unavailing.  The record demonstrates that NJSEA evaluates each application on its own merits, focusing on science and configuration, the surrounding context, and the degree of functional loss to District wetlands.  Moreover, the record shows the American Dream project, which is situated in a sports and entertainment zone, with a separate planning history intertwined with public interests, was approved for a different land use and under a different planning rationale, not controlled by the application of the Route 3 Redevelopment Plan's stricter "minimal to no impact requirement" for housing development.

Further, as stated in the 2020 Master Plan,

> Meadowlands Sports Complex contains the Meadowlands Sports Complex properties, including the American Dream Meadowlands site, MetLife Stadium, and the Meadowlands Racetrack, but excluding the area containing Walden Swamp, which is included under the [w]etlands category.  Although these properties are located within District boundaries and classified within this Master Plan and on land use maps, this Master Plan does not apply to the Meadowlands Sports Complex site, pursuant to N.J.S.A. 5:10A-10.  Lands within this classification are owned by . . . NJSEA and are exempt from District zoning regulations.

Therefore, ER2's argument lacks merit.

Finally, ER2 maintains that even if summary disposition was proper on the merits, a remand is necessary to resolve disputed or mixed questions of fact and law regarding the consistency of the proposed project with the Master Plan's "minimal to no impact" wetlands standard. We disagree.

The record clearly shows the parties jointly stipulated to all material facts, agreed the matter could be decided as a legal dispute, and presented the ALJ with a complete record suitable for summary adjudication. The ALJ found the record was fully developed and ripe for disposition without further fact-finding.

Remand is only appropriate when "the absence of particular findings hinders or detracts from effective appellate review." In re Renewal Application of TEAM Acad. Charter Sch., 247 N.J. 46, 75 (2021). Here, the ALJ's initial decision set forth the relevant facts and rationale in detail. We discern no material dispute of fact regarding the scope or nature of the proposed development and its environmental context warranting a remand.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

24                                                          A-2660-23